UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ILLINOIS TOOL WORKS, INC., et al., | CASE NO. C07-2061JLR |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART SEATTLE SAFETY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING NON-PATENT CLAIMS |
| v. | |
| SEATTLE SAFETY, LLC, | |
| Defendant. | |

## I.   INTRODUCTION

This matter comes before the court on Defendant Seattle Safety, LLC's ("Seattle Safety") motion for partial summary judgment regarding non-patent issues.  (Dkt. ## 192 (redacted) & 193 (sealed).)  Seattle Safety seeks partial summary judgment:  (1) that the statute of limitations bars Plaintiffs' claim based on Washington's Uniform Trade Secrets Act ("UTSA"), RCW ch. 19.108, as well as other tort claims to the extent those claims are based on alleged misappropriation of information, (2) that Plaintiffs' claims for

1  conversion and unfair competition should be dismissed for lack of proof, and (3) that

2  Plaintiffs' claim based on violation of Washington's Consumer Protection Act ("CPA"),

3  RCW 19.86.20, should be dismissed due to a lack of impact on Washington State

4  residents and on the public interest.  Having reviewed the motion, as well as all

5  submissions filed in support and in opposition to the motion, and having heard the oral

6  argument of counsel on October 29, 2010, the court GRANTS in part and DENIES in

7  part Seattle Safety's motion.

8        In addition, Seattle Safety also seeks partial summary judgment on grounds that

9  the economic loss rule bars some of Plaintiffs' tort claims.  (Mot. at 11-14.)  On

10  November 4, 2010, the Washington Supreme Court issued two new decisions interpreting

11  its prior jurisprudence with regard to the economic loss rule, and announcing a new rule

12  denominated the "independent duty doctrine."  *See Eastwood v. Horse Harbor Found.,*

13  *Inc.,* ___ P.3d ___, No. 81977-7, 2010 WL 4361986 (Wash. Nov. 4, 2010) & *Affiliated*

14  *FM Ins. Co. v. LTK Consulting Servs., Inc.,* ___ P.3d ___, No. 82738-9,  2010 WL

15  4350338 (Wash. Nov. 4, 2010).  On November 5, 2010, the court ordered the parties to

16  submit additional briefing concerning the impact of these new decisions on Seattle

17  Safety's motion for partial summary judgment regarding the economic loss rule.  (Min.

18  Order (Dkt. # 280).)  The court reserves ruling on this issue until following receipt of the

19  parties' supplemental memoranda.

20                          **II.    BACKGROUND**

21        The parties to this litigation are competing crash sled manufacturers.  Crash sleds

22  are the machines that car manufacturers use to simulate the results of car crashes.

ORDER- 2

1   (Wittman Decl. (Dkt. # 177) ¶ 2.)  Crash sleds fall into two broad categories:

2   acceleration sleds and deceleration sleds.  (*Id.* ¶ 3.)

3         The conflict between Seattle Safety and the two plaintiffs in this action, Illinois

4   Tool Works, Inc. ("ITW") and Dr. Steffan Datentechnik GmbH ("DSD"), arises out of a

5   failed collaboration between Seattle Safety and DSD.  In the late 1990s, DSD developed

6   a new type of acceleration crash sled called the Hyper-G that, unlike existing sleds, was

7   capable of using a brake to control the sled's acceleration.  (Steffan Decl. (Dkt. ## 218

8   (redacted) & 219 (sealed)) ¶ 3.)  DSD sought a distribution partner for its new sled, and

9   entered into a contract with Seattle Safety on March 31, 2000 under which Seattle Safety

10  agreed in part to market DSD's Hyper-G sled.  (*See* Steffan Decl. ¶ 5 & Ex. A; Wittman

11  Decl. Ex. 6.)  At the time that it entered into this agreement with DSD, Seattle Safety had

12  produced and sold deceleration sleds, but had not yet produced its own acceleration sled.

13  (*See* Steffan Decl. ¶ 5; Wittman Decl. ¶ 6.)

14        Although DSD and Seattle Safety's collaboration lasted for over three years, the

15  relationship eventually soured, and DSD cancelled the contract effective May 14, 2003.

16  (Steffan Decl. ¶ 7; Wittman Decl. Ex. 3.)  Shortly after the contract's termination, Seattle

17  Safety began selling its own acceleration sled, known as the ServoSled.  (*See* Wittman

18  Decl. ¶ 12.)  Like the Hyper-G, the ServoSled was capable of using a friction brake to

19  control the rate of the sled's acceleration.  (*Id.*)  Seattle Safety installed its first ServoSled

20  in late 2004.  (*Id.* ¶ 13.)

21        Dr. Herman Steffan, a principal of DSD, learned of the initial ServoSled sale

22  shortly after it occurred, and sent an email to Seattle Safety's principals

ORDER- 3

1   "congratulat[ing]" them on the sale.  (Wittman Decl. ¶ 13, Ex. 4.)  At the time, however,

2   Dr. Steffan believed that DSD "had provided a lot of confidential information"

3   concerning the Hyper-G to Seattle Safety.  His testimony is as follows:

4              Q:   At that time did you believe that you had provided
             proprietary information to Seattle Safety about the
5              components of the machine?

6              A:  I was completely clear that we had provided a lot of
             confidential information on our system.

7
    (Wilkinson Decl. (Dkt. ## 179 (redacted) & 180 (sealed)), Ex. 10 (Steffan Dep.) at 102-
8   103.)

9          On March 15, 2004, a DSD employee emailed Dr. Steffan a link to the Seattle

10  Safety website.  (*Id.*, Ex. 3.)  The email contained a subject line, which stated "Hyper-G

11  2?"  (*Id.*)  Dr. Steffan testified that he understood this subject line to mean that the

12  email's author was trying to say that "this seems a copy of Hyper-G."  (*Id.*, Ex. 9 (Steffan

13  Dep.) at 98.)  After clicking on the hyper-link to the Seattle Safety webpage contained in

14  the email, Dr. Steffan testified that he was "rather sure" that he thought that there were

15  "at least several huge similarities" between the Hyper-G and ServoSled.  (*Id.*, Ex. 9 at

16  99.)  Dr. Steffan further testified:

17             Q:   And did looking at that home page, and seeing
             similarities, cause you concern that Seattle Safety was using
18             DSD proprietary information?

19             A:  That was my conclusion from that. . . .

20  (*Id.*)

21         On April 19, 2004, a DSD employee received a telephone call from DSD's brake

22  pad supplier.  (*Id.* Ex. 13 (Hofinger Dep.) at 122-123.)  The supplier told the DSD

ORDER- 4

1  employee that Seattle Safety had called and requested brake pad information.  (*Id*., Ex. 13

2  at 122.)  The supplier also told the DSD employee that the system that Seattle Safety

3  described "seemed to be quite similar to [DSD's] system" (*id.*) or "to the Hyper-G

4  system" (*id.*, Ex. 13 at 124).   Indeed, the supplier told the DSD employee that ". . . he

5  thought he had already seen the [Seattle Safety] system somewhere, exactly in [DSD's]

6  company." (*Id*.)

7       The DSD employee discussed the phone call with a co-owner of DSD (*id.*, Ex. 13

8  at 125 & Ex. 9 (Steffan Dep.) at 91), as well as one of DSD's managers, who was

9  responsible for management of the office in Linz, Austria, and also responsible for

10 development work on the Hyper-G (*see id.* Ex. 14 (Moser Dep.) at 128, 134).  The

11 manager testified that "the information we got from the supplier was for us a strong

12 evidence that [Seattle Safety was] trying to get the same brake pad material" used by

13 DSD.  (*Id.,* Ex. 14 at 134.)  The identity of the brake pad material is one of the specific

14 trade secrets that DSD has alleged was misappropriated.  (*Id.,* Ex. 5.)

15      In May 2004, Dr. Steffan attended a trade show in Stuttgart, Germany, and viewed

16 Seattle Safety's booth.  (*Id.*, Ex. 16 (Wittman Dep.) at 149-150, Ex. 9 (Steffan Dep.) at

17 94-95; Wittman Decl. ¶ 19, Ex. 5.)  Dr. Steffan testified that, based on the "details" about

18 the ServoSled shown at Seattle Safety's booth, he "thought there could be a lot of know-

19 how from our side in this system" and "realized that . . . there could be a potential

20 problem that Seattle [Safety] [wa]s using [DSD's] proprietary information."  (Wilkinson

21 Decl., Ex. 9 (Steffan Dep.) at 93, 95-96.)  He testified that at this point he was concerned,

22

1    but not sure, if Seattle Safety was using DSD's proprietary information.  (*Id.,* Ex. 9 at

2    96.)

3            Throughout 2004, Dr. Steffan continued to hear about the ServoSled.  Dr. Steffan

4    testified that "[l]ots of customers" told him in 2004 that they thought the ServoSled was

5    "very similar" to the Hyper-G.  (*Id.*, Ex. 10 (Steffan Dep.) at 104.)  Dr. Steffan also

6    testified that during 2004 it was assumed that the ServoSled was "at least partially based

7    on know-how [Seattle Safety] gained from [DSD]."  (*Id.*, Ex. 10 at 105.)  When

8    customers asked him about Seattle Safety during that period, Dr. Steffan testified that he

9    would say that Seattle Safety was "using a lot of proprietary information," and that "[i]t's

10   exactly our patent, what they do."  (*Id.*, Ex. 10 at 104.)

11           DSD contends that, despite the foregoing undisputed chain of events, it did not

12   receive sufficient information to bring a claim concerning Seattle Safety's

13   misappropriation of information until 2007.  DSD's claim for trade secret

14   misappropriation is based on six discrete Hyper-G features.  (*See* Steffan Decl. ¶ 9, Ex.

15   B.)  Four of these trade secrets are software components found in the Hyper-G control

16   system, and Plaintiffs assert that determining their presence requires either operating the

17   system, analyzing its control software, or reviewing the supporting technical documents.

18   (*Id.*)  The other two trade secrets relate to internal physical components of the system,

19   and Plaintiffs assert that discerning the presence of these two trade secrets likewise

20   requires either disassembling the system or accessing pertinent technical drawings.  (*Id.*)

21           Although DSD had heard of the similarities between its product and the ServoSled

22   from a variety of people in 2004, prior to 2005, DSD did not have physical access to a

1  ServoSled, had not seen one in operation, did not have access to its components or

2  software, and had never seen ServoSled specifications or documentation describing its

3  control system.  (*Id.* ¶ 11.)  In February 2005, DSD obtained a ServoSled marketing

4  brochure.  (*Id.* ¶ 12 & Ex. C.)  DSD asserts that it was only upon receiving this brochure

5  that it knew for the first time that the ServoSled used control software.  (*Id.* ¶ 12.)

6        In 2007, DSD obtained portions of the ServoSled software and maintenance

7  manuals for the first time.  (Stahl Decl. (Dkt. ## 217 (sealed) & 216 (redacted)), Ex. E at

8  118-119.)  After reviewing this manual, Dr. Steffan testified that he could see that Seattle

9  Safety's control system operated in fundamentally the same manner as Hyper-G's control

10 system.  (*See* Steffan Decl. ¶ 13 & Ex. D.)  DSD asserts that this was the "first time" it

11 had "clear evidence" that Seattle Safety had misappropriated DSD's trade secrets.  (Resp.

12 Mem. at 6.)  DSD asserts that it was only after receiving these manuals that it believed it

13 had sufficient factual support to accuse Seattle Safety of infringing its trade secrets.

14 (Steffan Decl. ¶ 13; Resp. Mem. at 6.)

15       On September 14, 2007, DSD and ITW executed an agreement transferring the

16 Hyper-G and associated intellectual property to ITW.  (Wilkinson Decl. Ex. 8.)  One of

17 the assets transferred was DSD's rights under its former contract with Seattle Safety.  (*Id.*

18 at 53.)

19                     **III.   ANALYSIS**

20 **A.  Standards**

21       Summary judgment is appropriate "if the pleadings, the discovery and disclosure

22 materials on file, and any affidavits show that there is no genuine issue as to any material

1    fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

2    56(c)(2).  The plain language of Rule 56(c) mandates the entry of summary judgment,

3    after adequate time for discovery and upon motion, against a party who fails to make a

4    showing sufficient to establish the existence of an element essential to that party's case,

5    and on which that party will bear the burden proof at trial.  *Celotex Corp. v. Catrett*, 477

6    U.S. 317, 322 (1986).

7         In Washington, where a defendant moves for summary judgment on the basis of

8    an affirmative defense such as the statute of limitations, the defendant bears the initial

9    burden of proving the absence of a material issue of fact as to that defense.  *Precision*

10   *Airmotive Corp. v. Rivera,* 288 F. Supp. 2d 1151, 1153 (W.D. Wash. 2003) (citing

11   *Haslund v. City of Seattle,* 547 P.2d 1221, 1230 (Wash. 1976)).  Where, however, a

12   plaintiff invokes the discovery rule to counter the statute of limitations defense, the

13   burden is on the plaintiff to show facts demonstrating that the cause of action was not

14   discovered or could not have been discovered by due diligence within the limitations

15   period.  *Precision Airmotive,* 288 F. Supp. 2d at 1153 (citing *G.W. Constr. Corp. v. Prof'l*

16   *Serv., Indus., Inc.,* 853 P.2d 484, 488 (Wash. Ct. App.  1993) & *Giraud v. Quincy Farm*

17   *and Chem.,* 6 P.3d 104, 109 (Wash. Ct. App.  2000) ("To invoke the discovery rule, the

18   plaintiff must show that he or she could not have discovered the relevant facts earlier.")).

19        Where summary judgment is based on application of the statute of limitations, the

20   motion should be granted only if the record demonstrates that there is no genuine factual

21   issue as to the commencement of the statutory period.  *McLeod v. Northwest Alloys, Inc.,*

22   969 P.2d 1066, 1069 (Wash. Ct. App.  1998).  When a plaintiff discovers a cause of

action, or whether a plaintiff has exercised reasonable diligence to discover the action, is

generally a question of fact.  However, if reasonable minds could not differ, then it is a

question of law.  *Cawdry v. Hanson Baker Ludlow Drumheller, PS,* 120 P.3d 605, 609

(Wash. Ct. App.  2005) (citing *Goodman v. Goodman,* 907 P.2d 290, 294 (Wash. 1995)).

**B.  Statute of Limitations on Misappropriation of Trade Secrets and Other Torts**

Seattle Safety has asserted the statute of limitations as an affirmative defense to

Plaintiffs' UTSA claim.  (Answer (Dkt. # 95) at 8.)  Washington's UTSA establishes a

three-year limitations period:

> An action for misappropriation must be brought within three
> years after the misappropriation is discovered or by the exercise
> of reasonable diligence should have been discovered. . . .

RCW 19.108.060.  As the statutory language provides, the UTSA expressly incorporates

the "discovery rule."

Under the discovery rule, a cause of action accrues when the claimant knew or

should have known the essential elements of the cause of action.  *McLeod*, 969 P.2d at

1071 (citing *Allen v. State,* 826 P.2d 200, 203 (Wash. 1992)).  Nevertheless, "[t]he key

consideration under the discovery rule is the factual, not the legal, basis for the cause of

action."  *Allen,* 826 P.2d at 203.  "The cause of action accrues when the claimant knows

or should know the relevant facts, 'whether or not the plaintiff also knows that these facts

are enough to establish a legal cause of action.'"  *McLeod,* 969 P.2d at 1069-70 (quoting

*Allen,* 826 P.2d at 203).

1    Analysis of UTSA's statute of limitations "must be performed with reference to

2   the statutory definition of the term 'misappropriation.'" *McLeod*, 969 P.2d at 1071.

3   Misappropriation is defined as the "*[a]cquisition* of a trade secret . . . by improper

4   means," or the "*[d]isclosure or use* or a trade secret . . . without express or implied

5   consent . . . ."  RCW 19.108.010(2)(a) & (b) (italics added).  Thus, analysis of the

6   limitations period "focuses on facts related to the acquisition, disclosure or use of a trade

7   secret." *McLeod,* 969 P.2d at 1069.  When the disclosure of trade secrets is authorized, as

8   it was here pursuant to the parties' contractual relationship, "facts related to the use of the

9   trade secret and the claimant's knowledge of this use will be determinative." *Id.* at 1071.

10   Nevertheless, the "primary focus" of the court's statute of limitations analysis remains

11   "on the application of the discovery rule established in RCW 19.108.060." *Id.*

12    Plaintiffs acknowledge that the discovery rule governs their UTSA claim against

13   Seattle Safety, but argue that "[m]ere suspicion of a claim is not enough."  (Resp. (Dkt.

14   ## 214 (redacted) & 215 (sealed) at 7) (citing *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d

15   1139, 1148 (9th Cir. 2002).)  The court agrees that *mere* suspicion is not sufficient to

16   trigger Washington's discovery rule; at a minimum the suspicion that a specific wrongful

17   act has occurred must be reasonable.  *Beard v. King County,* 889 P.2d 501, 504 (Wash.

18   Ct. App.  1995).

19    The *Beard* court elaborates on the application of Washington's discovery rule:

20    [T]he limitation period begins to run when the factual
     elements of a cause of action exist and the injured party
21    knows or should know they exist, whether or not the party
     can then conclusively prove the tortious conduct has
22    occurred.  A smoking gun is not necessary to commence the

limitation period.   An injured claimant who *reasonably suspects* that a specific wrongful act has occurred is on notice that legal action must be taken.   At that point, the potential harm with which the discovery rule is concerned – that remedies may expire before the claimant is aware of the cause of action – has evaporated.   The claimant has only to file suit within the limitations period and use the civil discovery rules within that action to determine whether the evidence necessary to prove the cause of action is obtainable.   If the discovery rule were construed so as to require knowledge of conclusive proof of a claim before the limitations period begins to run, many claims would never be time-barred.

*Id.*  (italics added).

Plaintiffs argue that *Beard* is inapplicable because it is not a trade secrets case. However, there is nothing in UTSA to indicate that the discovery rule codified in the Act is anything other than the traditional discovery rule that has been applied by Washington courts to numerous types of actions,[1] and codified by the Legislature in a wide variety of statutes, of which UTSA is just one.[2]  Indeed, in *McLeod,* the court expressly notes that it is applying "a traditional discovery rule analysis" to a UTSA claim.  969 P.2d at 1071. Thus, the court concludes that the guidance provided in *Beard* with regard to Washington's discovery rule is applicable here.  The court does acknowledge, however, that what constitutes a reasonable suspicion on the part of a plaintiff will vary depending on the factual context of the case and the type of claim that is brought.

---

[1] *See In re Matter of Parentage of C.S.,* 139 P.3d 366, 369 & n.7 (Wash. Ct. App.  2006) (collecting cases).

[2] For example, the Washington Legislature has codified the discovery rule into statutes of limitation for fraud, RCW 4.16.080(4), personal injury arising from acts of childhood sexual abuse, RCW 4.16.340, medical malpractice, RCW 4.16.350, and Uniform Commercial Code claims for breach of warranty of future performance, RCW 62A.2-725(2).

With regard to application of the discovery rule here, there is no factual dispute concerning the timeline of events in this matter.  Rather, the parties' dispute centers on when the discovery rule should be triggered under the facts stated.  Seattle Safety asserts that DSD was on notice as early as the first half of 2004 because by that time DSD knew that it had transferred "a lot of" proprietary information to Seattle Safety as a result of the prior distribution agreement, and DSD knew that Seattle Safety was producing and attempting to sell a product (the ServoSled) that appeared to be a copy of or to have significant similarities with DSD's Hyper-G sled.  In addition, DSD knew in 2004 that Seattle Safety was attempting to acquire information concerning Hyper-G's brake pad material which is one of the specific trade secrets that DSD has alleged Seattle Safety misappropriated.  If the discovery rule was triggered anytime prior to December 21, 2004, then the Plaintiffs' claim for misappropriation of trade secrets, which filed on December 21, 2007, is time barred.

DSD counters that in 2004 it did not have physical access to a ServoSled, had not seen one in operation, did not have access to its components or software, and had never seen ServoSled specifications or documentation describing its control system.  DSD asserts that the discovery rule was not triggered until 2007 when it obtained portions of the ServoSled software and maintenance manuals for the first time, and confirmed that Seattle Safety's control system operated in fundamentally the same manner as Hyper-G's control system.  Prior to this time, DSD asserts that, although it was concerned that Seattle Safety had misappropriated trade secrets, it could not be sure and did not have

1   clear evidence that a cause of action existed.  If the discovery rule was not triggered until

2   2007, then DSD's claim is not time barred.

3       In the case at hand, it was not necessary for DSD to confirm that the ServoSled's

4   control system operated in the same manner as the Hyper-G (as DSD asserts it finally did

5   in 2007) for DSD to reasonably suspect that Seattle Safety had misappropriated its trade

6   secrets.  As the *Beard* court states, neither conclusive proof nor a smoking gun is

7   necessary.  *Id.*  Rather, the statute begins to run as soon as the plaintiff reasonably

8   suspects that a specific wrongful act has occurred.  At that point, the plaintiff is on notice

9   that legal action must be taken.  *Id.*

10      That point in time occurred in 2004 for DSD.  Dr. Steffan has admitted that the

11  fact that he had given trade secrets to Seattle Safety (in the form of modeling

12  information), combined with the fact that Seattle Safety was building a sled which

13  operated in a similar manner to the Hyper-G, was sufficient to cause him to reasonably

14  assume that Seattle Safety was using proprietary information.  (Wilkinson Decl. Ex. 10 at

15  105.)  DSD knew at the termination of its contractual relationship with Seattle Safety in

16  2003 that Seattle Safety had acquired some of DSD's trade secrets as a result of their

17  collaboration.  Indeed, the contract between the parties provided for the handling of such

18  confidential information both during the contract period and following termination.[3]

19  (Wittman Decl. Ex. 6.)  Moreover, as indicated above, beginning in March 2004 and

20  continuing throughout the year, numerous people, including employees, suppliers, and

21  

22      [3] Further, Dr. Steffan has expressly admitted that DSD "provided a lot of confidential
information on our system" to Seattle Safety.  (Wilkinson Decl. Ex. 10 at 102-103.)

1   customers, were alerting DSD to the strong similarities between its product and the

2   ServoSled.  Moreover, Dr. Steffan was responding to customers during this timeframe by

3   telling them that Seattle Safety was "using a lot of [DSD's] proprietary information."

4   (Wilkinson Decl. Ex. 10 at 104.)  On these facts, reasonable minds could not differ that

5   DSD either reasonably suspected that Seattle Safety was misappropriating trade secrets or

6   it should have so suspected.  Thus, by the time that DSD and ITW had filed suit on

7   December 21, 2007, the statute of limitations (which had begun running prior to that date

8   in 2004) had already expired.

9         The court finds *Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358 (5th Cir. 2000),

10  instructive.  In *Seatrax*, a manufacturer of offshore marine cranes brought an action

11  against an aftermarket parts supplier for misappropriation of trade secrets.  Several

12  employees had left the manufacturer's former licensee and gone to work for the

13  defendant.  *Id.* at 365.  While at the former licensee, the employees had access to trade

14  secrets such as drawings.  *Id.*  After the former employees joined the defendant company,

15  the plaintiff heard a "lot of innuendos and rumors" about the defendant's role in

16  distributing plaintiff's crane parts.  *Id.*  Further, at least three customers raised questions

17  with the plaintiff about the defendant's status as a distributor of the plaintiff's parts.  *Id.*

18  at 366.  The court found that the combination of former employees of plaintiff's licensee

19  starting a new company that sold a product line similar to that marketed by plaintiff's

20  licensee, along with all of the "innuendos and rumors," created "a red flag for possible

21  misappropriation of trade secrets," and triggered commencement of the statutory period.

22  *Id.* at 367.  Because the plaintiff failed to file suit within the statutory timeframe, the

1    court granted summary judgment.  *Id.* ("[S]ummary judgment evidence indicates that

2    [plaintiff] failed to exercise reasonable diligence to discover its cause of action").

3         Similarly, here, it is undisputed that Seattle Safety through its contractual

4    relationship with DSD had access to DSD's trade secrets.  It is also undisputed that as

5    early as 2004, Seattle Safety began distributing the ServoSled, which DSD believed was

6    highly similar to its own Hyper-G.  There is also no dispute that employees, suppliers,

7    and customers had all alerted DSD to the similarity of Seattle Safety's sled to the Hyper-

8    G beginning as early as March 2004, and continuing during that year.  Like *Seatrax,* these

9    facts constituted a "red flag for possible misappropriation of trade secrets."  *Id.* at 366-67;

10   *see also McLeod,* 969 P.2d at 1071 (undisputed facts that plaintiff knew trade secrets

11   were disclosed to defendant, and that defendant had begun tests using the trade secret,

12   commenced the running of the statute of limitations on that day).  On the basis of the

13   foregoing undisputed facts, reasonable minds could not differ that by the time DSD and

14   ITW filed suit on December 21, 2007, the three-year statute of limitations was already

15   exhausted.  Thus, the court is compelled to grant summary judgment to Seattle Safety on

16   grounds that the Plaintiffs' UTSA claim is barred by the statute of limitations. [4]

17   _____

18   [4] Plaintiffs rely primarily on *Veritas Operating Corp. v. Microsoft Corp.,* No. C06-0703-
     JCC, 2008 WL 474248 (W.D. Wash. Feb. 4, 2008), in which the court denied summary
19   judgment on the statute of limitations in response to plaintiff's argument that it could not have
     discovered the misappropriation of its computer code until it received the latest version of
20   Microsoft's operating system.  However, in doing so, the court emphasized plaintiff's diligent
     efforts, involving "much discussion, negotiations, and numerous letters," to discover whether a
21   claim existed.  *Id.* at *11.  Further, the court noted Microsoft's delay in providing the plaintiff the
     code, *id.,* as well as Microsoft's pattern of "deception and obfuscation of the true facts" over
22   several years.  *Id.* at *10.  There are no similar allegations against Seattle Safety here.  Nor has
     DSD recited facts constituting diligent efforts on its part to discover whether a claim against

ORDER- 15

1    Seattle Safety also seeks summary judgment based on the running of the

2    limitations period with regard to some of the Plaintiffs' other tort claims, including

3    breach of confidential relationship (fifth cause of action), and breach of fiduciary duty

4    (sixth cause of action), Plaintiff's claim for unjust enrichment (eighth cause of action)),

5    and Plaintiffs' claim for breach of the covenant of good faith and fair dealing (third cause

6    of action).  These claims also carry a three-year statute of limitations.  RCW 4.16.080(2)

7    (tort claims); RCW 4.16.080(3) (unjust enrichment); *Eckert v. Skagit Corp,* 583 P.2d

8    1239, 1240 (Wash. Ct. App.  1978) (unjust enrichment); *Steinberg v. Seattle First Nat'l*

9    *Bank,* 832 P.2d 124, 125  n. 4 (1992) (good faith and fair dealing).  To the extent that

10

11

12

13

14   Seattle Safety existed.  For similar reasons, *Mass. Eye and Ear Infirmary v. QLT*
     *Phototherpeutics, Inc.,* 412 F.3d 215 (1st Cir. 2005), is also distinguishable.  There, defendant

15   gave plaintiff "repeated assurances" that its trade secrets were not being disclosed, *id.* at 241, and
     the court found it "reasonable . . . to assume that [the defendant's] purpose in making assurances

16   to [the plaintiff] could have been to delay a suit that would include trade secret claims." *Id.* at
     242.  Again, similar allegations of false reassurances are absent here.

17        Plaintiffs also rely on *Accenture Global Servs. GmbH v. Guidewire Software, Inc.,* 691 F.
     Supp. 2d 577 (D. Del. 2010).  Like *Veritas, Accenture* involves the misappropriation of trade

18   secrets concerning computer software.  The court finds allegations of misappropriation of
     intangible items such as computer software to be factually distinct from the type of

19   misappropriation alleged here involving crash test sleds.  While the court recognizes that part of
     Plaintiffs' claim involves control software, Plaintiffs have also alleged misappropriation

20   involving physical components such as brake pads.  (*See* Steffan Decl. ¶ 9, Ex. B.)  Such tangible
     items were not at issue in either *Veritas* or *Accenture.*  Further, once Plaintiffs were aware in

21   2004 that Seattle Safety was allegedly attempting to misappropriate information concerning
     Plaintiffs' brake pads, it would have been unreasonable for Plaintiffs to assume that Seattle

22   Safety could be trusted to protect any other secrets, including intangible items such as control
     software. *See, e.g., Forcier v. Microsoft Corp.,* 123 F. Supp. 2d 520, 525 (N.D. Cal. 2000);
     *Intermedics, Inc. v. Ventritex, Inc.,* 822 F. Supp. 634, 654 & n.19 (N.D. Cal. 1993)).

1    these claims are based on Seattle Safety's misuse of DSD's trade secrets, the court grants

2    summary judgment with regard to these claims as well.[5]

3    **C. Conversion and Unfair Competition**

4        Seattle Safety has moved for summary judgment with regard to Plaintiffs' claims

5    for conversion and unfair competition.  Seattle Safety asserts that Plaintiffs' have failed

6    to make an evidentiary showing sufficient to avoid summary judgment with regard these

7    two claims.  (Mot. at 15-16.)

8        In December 2008, the court dismissed most of Plaintiffs' conversion claim as

9    preempted by Washington's UTSA.  (Order (Dkt. # 34) at 4-6.)  However, the claim

10   survived "only to the extent that Seattle Safety converted physical property or other

11   types of property," including "physical items connected to Seattle Safety's alleged

12   improper 'possession and control of proprietary information provided by DSD.'"  (Order

13   (Dkt. # 41) at 3 & n. 1 (quoting Compl. (Dkt. # 1) ¶ 48).)  On June 10, 2009, Plaintiffs

14   filed an amended complaint in which they once again alleged a cause of action for

15   conversion, asserting that Seattle Safety "improperly took possession and control of the

16   proprietary information provided by DSD, including without limitation documentation,

17   material and other physical components of Hyper-G technology."  (Am. Compl. (Dkt. #

18   93) ¶ 67.)

19

20   ───────────────

21   [5] The court notes that Plaintiffs have asserted that factual allegations unrelated to the
     misappropriation of trade secrets undergird these claims as well.  (Resp. at 9-10.)  Defining the
     specific contours of what, if anything, may remain of these claims in light of this order is not an

22   issue that the court addresses today.

1    In their opposition to Seattle Safety's motion for summary judgment, Plaintiffs

2  asserts that Seattle Safety wrongfully obtained and converted samples of Hyper-G brake

3  pad material and drawings of the Hyper-G brake design.  (Resp. at 14-15.)  Seattle Safety

4  disputes Plaintiffs' recitation and interpretation of the facts surrounding these items.

5  (Reply at 8.)  Nevertheless, Plaintiffs have successfully raised a material issue of fact

6  sufficient to present to the jury with regard to this claim.  Accordingly, the court denies

7  Seattle Safety's motion for summary judgment with regard to Plaintiffs' claim for

8  conversion.

9    Seattle Safety also moved for summary judgment of Plaintiffs' claim for unfair

10  competition.  (Mot. at 16.)  On December 17, 2008, the court dismissed Plaintiffs' claim

11  for unfair competition.[6]   (Order (Dkt. # 34) at 11-14.)  In its ruling, the court found that

12  Plaintiffs' unfair business competition claim was preempted by Washington's UTSA "to

13  the extent it [wa]s not factually independent from [Plaintiffs'] misappropriation claim,"

14  but was "not preempted . . . as it relate[d] to Seattle Safety's alleged improper

15  commercialization under the contract."  (*Id.* at 13.)  Nevertheless, the court went on to

16  rule:

17            Despite the court's conclusion as to preemption under the
           UTSA, it does not follow that Plaintiffs' unfair competition
18           claim survives review under Rule 12(c). . . . [T]he economic

19  _____

20  [6] On June 10, 2009, Plaintiffs re-plead this claim in their amended complaint. The court
     recognizes that to preserve their appeal rights with regard to their claim for unfair competition,
21   Plaintiffs were required to re-plead this cause of action in their amended complaint, despite the
     court's earlier dismissal.  *See Marx v. Loral Corp.,* 87 F.3d 1049, 1055-56 (9th Cir. 1996)
22   ("Ninth Circuit authority clearly states that all causes of action alleged in an original complaint
     which are not alleged in an amended complaint are waived.") (internal quotations omitted).

1      loss rule functions to preclude Plaintiffs from recovering in
tort economic losses to which their entitlement flows only
2      from contract. . . . [Plaintiffs'] unfair competition claim
straddles the boundary between tort and contract.  The court's
3      review of the complaint and Plaintiffs' response indicates that
Plaintiffs' unfair competition claim is predicated on a
4      contractual provision assigning an exclusive right of
commercialization of the Hyper-G technology to DSD. . . .
5      Plaintiffs' losses are economic in nature; they have not
alleged personal injury or property damage. . . . As discussed
6      above, Plaintiffs may recover for this alleged breach but must
do so as part of their contract claim.  The court concludes that
7      Plaintiffs' unfair competition claim is barred by the economic
loss rule.  The court DISMISSES Plaintiffs' seventh cause of
8      action for unfair competition.

9 (Order (Dkt. # 34) at 13-14.)

10      As noted above, since the court's ruling on December 17, 2010 ruling, the

11 Washington Supreme Court has issued two new decisions which address the prior

12 development of case law concerning the economic loss rule, and denominate a new rule

13 known as the "independent duty doctrine."  *See Eastwood,* 2010 WL 4361986 &

14 *Affiliated FM Ins. Co.,* 2010 WL 4350338.  Under this doctrine, "[a]n injury is

15 remediable in tort if it traces back to the breach of a tort duty rising independently of the

16 terms of the contract."  *Eastwood,* 2010 WL 4361986 at *12.  The court has already

17 directed the parties to provide supplemental memorandum concerning the impact of these

18 new decisions, and thus will defer ruling on whether Plaintiffs' claim for unfair

19 competition remains barred under Washington's new independent duty doctrine.

20      However, irrespective of whether Plaintiffs' unfair competition claim is barred by

21 Washington's independent duty doctrine, Plaintiffs' have failed to raise a genuine issue

22 of fact with regard to this claim for trial.  As the court has previously noted, Washington

ORDER- 19

1   law limits common law claims for unfair business competition to claims for "passing

2   off." *Childers v. Sagem Morpho, Inc.,* No. C06-0060RSM, 2006 WL 3734151 at *5

3   (W.D. Wash. Dec. 15, 2006) (citing *Ivan's Tire Serv. Store, Inc. v. Goodyear Tire &*

4   *Rubber Co.,* 517 P.2d 229, 237 (Wash. Ct. App. 1973)).  "Passing off" refers to "the

5   appropriation of a competitor's name or symbols or the substitution of goods so as to

6   deceive the public." *Boggs v. Whitaker, Lipp & Helea, Inc.,* 784 P.2d 1273, 1275 (Wash.

7   Ct. App. 1990).  Plaintiffs' evidence to support their allegation of "passing off" consists

8   of testimony and documents indicating that Seattle Safety contacted a customer that had

9   considered buying a Hyper-G, and offered to sell the customer a ServoSled instead.

10  (Resp. at 15 (citing Stahl Decl. Ex. Z (Wittman Dep.) at 48-49, 51-52 & Ex. AA.) In do

11  so, Plaintiffs assert that Seattle Safety told the customer that the "fundamental operation"

12  of the ServoSled and the Hyper-G was "the same."  (Stahl Decl. Ex. AA.)  While this

13  conduct may be actionable under some other cause of action, it does not constitute

14  "passing off."  Indeed, the evidence cited by Plaintiffs demonstrates that Seattle Safety

15  made a clear distinction between its "newer system" which "does not use the components

16  supplied by DSD," and "the system using DSD components" when comparing the two.

17  (*Id.*)  None of this evidence, even viewed in the light most favorable to Plaintiffs,

18  indicates that Seattle Safety was attempting to "pass off" a ServoSled as a Hyper-G.

19        Plaintiffs also assert that they have evidence of "reverse passing off" by Seattle

20  Safety.  (Resp. at 15.)  Even assuming such conduct is cognizable in Washington to

21

22

ORDER- 20

1   undergird a common law claim for unfair competition,[7] and that the claim is not

2   preempted by federal law,[8] Plaintiffs have once again failed to raise a genuine issue of

3   fact.  The only evidence of "reverse passing off" they cite is Seattle Safety's

4   identification, during sales presentations, of two customers from the period of DSD's and

5   Seattle Safety's collaboration as prior "ServoSled" customers.  (Resp. at 15 (citing Stahl

6   Decl. Ex. A (Coughren Dep.) 16, 29-30 & Ex. BB).)

7         Although there is no Washington law defining the necessary elements of this

8   claim, the Ninth Circuit has described "reverse passing off" as situations in which the

9   defendant allegedly removes the name on another party's product and sells that product

10   under the name of the defendant, removes the name of the manufacturer and sells the

11   product in an unbranded state, or sells or offers for sale another's product that has been

12   modified slightly and labeled with a different name.  *Cleary v. News Corp.,* 30 F.3d 1255,

13   1261 (9th Cir. 1994).  All of these instances involve the defendant acquiring the

14   plaintiff's product and selling that product as the defendant's own, whether in its original

15   state or in a slightly modified one.  Here, the evidence, when viewed in a light most

16

----

17     [7] The court was unable to find any Washington case involving allegations of "reverse
passing off" in the context of a common law claim for unfair competition, and the parties did not
18   cite any.

19     [8] "[W]hile 'passing off' claims avoid 17 U.S.C. § 301 preemption, reverse passing off
claims tend not to survive."  *Cyber Websmith, Inc. v. Am. Dental Assoc.*, No. 09-CV-6198, 2010
20   WL 3075726 at *3 (N.D. Ill. Aug. 4, 2010).  "Courts nationwide recognize that the Copyright
Act preempts claims of 'reverse passing off' brought under state laws governing unfair and
21   deceptive trade practices."  *Rutledge v. High Point Regional Health Sys.,* 558 F. Supp. 2d 611,
621 n.4 (M.D.N.C. 2008) (citing myriad cases).  However, none of the parties have raised this
22   issue, and the court therefore declines to decide it.

1   favorable to Plaintiffs, involves at best the misidentification of the Plaintiffs' customers.

2   Plaintiffs have provided no evidence that Seattle Safety ever attempted to rebrand a

3   Hyper-G sled and sell it as its own, in either its original state or in a somewhat altered

4   form.  *See, e.g., Atlas Equip. Co., LLC v. Weir Supply Group, Inc.,* No. C07-1358Z, 2009

5   WL 4670154 at *6 (W.D. Wash. Sept. 15, 2009) (granting summary judgment of reverse

6   passing off claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), where

7   there was no evidence that defendant had ever purchased or acquired product from

8   trademark holder).

9          Further, some courts have also identified the likelihood of consumer confusion as

10  an element of "reverse passing off."  *See, e.g., id.*  Plaintiffs have identified no evidence

11  of consumer confusion as a result of Seattle Safety's marketing materials in which Seattle

12  Safety allegedly misidentified two out of 23 companies as former ServoSled customers.

13  The scintilla of evidence put forward by Plaintiffs with regard to a potential "reverse

14  passing off" claim is simply insufficient to create a genuine issue of material fact.  *See id.*

15  at *7.  Thus, the court grants Seattle Safety's motion for summary judgment on this

16  alternate ground with regard to Plaintiff's claim for unfair competition whether in the

17  form of "passing off" or "reverse passing off."

18  **D.  Washington's Consumer Protection Act**

19         Seattle Safety contends that the Washington State Supreme Court recently

20  determined that nonresidents of Washington, such as Plaintiffs here, do not have standing

21  to bring a Washington CPA claim.  In *Schnall v. AT&T Wireless Services, Inc*., 225 P.3d

22  929 (Wash. 2010), the Court states:

1                    Even the general extraterritorial flavor of RCW 19.86.920
cannot change the clear standing limitations in the statute:  a
2                    claimant must allege injury in trade or commerce that
'directly or indirectly affect[s] the people of the State of
3                    Washington.'"

4   *Id.* at 939 (quoting RCW 19.86.010(2)).  The Court continues that "[i]n the context of this

5   case, the CPA applies only to claims brought by persons residing in Washington."  *Id.*

6        Plaintiffs counter that the narrow question presented in *Schnall* was "whether

7   Washington will become a locus of nationwide class action litigation," *id.* at 932, and

8   therefore, neither *Schnall's* "context" nor its holding are applicable here.  Plaintiffs note

9   that Seattle Safety's principal place of business is in Washington, and thus to the extent

10   that Seattle Safety engaged in anti-competitive practices, which includes allegations of

11   bribery, interference with the competitive bidding process, and misrepresentations, many

12   of those acts would have originated in Washington.  (*See* Resp. at 16.)  While the court

13   agrees that reading *Schnall* to eliminate standing under the CPA for every nonresident

14   would be an overly broad interpretation, Plaintiffs interpretation limiting *Schnall* solely to

15   the class action context is too narrow.

16        Further, the Plaintiffs' emphasis on the location of Seattle Safety's principal place

17   of business is also misplaced.  The *Schnall* court's analysis was unaltered by the fact that

18   the defendant corporation (AT&T Wireless Services, Inc.) was based in Washington and

19   engaged in disputed transactions within the state.  *See Avritt v. Reliastar Life Ins. Co.,*

20   615 F.3d 1023, 1032-33 (8th Cir. 2010) (citing *Schnall*, 225 P.3d 944-45 (Sanders, J.

21   dissenting) (observing that the defendant was a Washington corporation and that

22   '[s]ignificant portions of each transaction occurred in Washington.")).  Rather, of critical

1   importance to the *Schnall* court was the connection – or lack thereof – between the CPA

2   claim at issue and the people of the state of Washington.  "To state a [CPA] claim a

3   person must show that the unfair or deceptive act affected the people of the state of

4   Washington." *Schnall,* 225 P.3d at 938.  The court explained that CPA actions, whether

5   they are pursued by the Washington Attorney General or a private citizen, may be

6   brought only on behalf of persons residing within the state.  *Id.* at 938-39.

7       Therefore, despite the location of Seattle Safety's principal place of business

8   within the state of Washington, there is an insufficient connection between the Plaintiffs'

9   CPA claim and the people of the state of Washington for Plaintiffs to be said to be acting

10  "on behalf of persons residing within the state."  *See id.*  Although Plaintiffs baldly assert

11  that Seattle Safety's "unfair acts hurts [sic] not just Plaintiffs, but customers, other sled

12  manufacturers, and others in the industry" (Resp. at 17), Plaintiffs cite no evidence in the

13  record that any of these individuals or entities are located in Washington.  To the

14  contrary, the record reveals that Plaintiff DSD is the only company that has ever

15  contracted with Seattle Safety to collaborate on the marketing or production of an

16  acceleration sled.  (Wittman Decl.  ¶ 24.)  Indeed, Seattle Safety asserts that Plaintiffs are

17  its only serious competitors (*see* Mot. at 18 (citing Wilkinson Decl.  Ex. 10 (Steffan

18  Dep.) at 204-05)), and Plaintiffs have not disputed this assertion.  The *Schnall* court

19  recognized "the Washington CPA as a tool for protecting the interests of Washington

20  citizens and residents."  *K.S. v. Ambassador Programs, Inc.,* No. CV-08-243-RMP, 2010

21  WL 1629247 at *2 (E.D. Wash. Apr. 21, 2010) (dismissing Virginian's claim against

22  Washington company which solicited plaintiff and others to apply for and participate in

trip to Australia).  Under the facts of this case, "Plaintiffs are certainly outside of th[e]

sphere of interest as determined in *Schnall*."  *Id.*  Accordingly, the court grants Seattle

Safety's motion for summary judgment with respect to the Plaintiffs' CPA claim.[9]

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Seattle

Safety's motion for partial summary judgment regarding non-patent issues (Dkt. ## 192

(redacted) & 193 (sealed)).

Dated this 8th day of November, 2010.

JAMES L. ROBART
United States District Judge

---

[9] Because the court resolves this issue on the basis of the standing requirement set forth in *Schnall*, the court does not reach the issue of whether Plaintiffs' CPA claim satisfies the "public interest" element of the claim, or is essentially a private dispute.  (*See* Mot. at 18.)